Thank you and good morning. The first case we'll hear is U.S. Ex Roll Watley v. Eastwick College, No. 15-3019. May it please the court. My name is Jim Plaston. I represent the plaintiffs in this matter. I would like to reserve five minutes for rebuttal time if that's permissible. Okay, that would be great. Thank you. This case was filed in February of 2013. It was unsealed thereafter and in November. The U.S. didn't intervene. The U.S. did not intervene. In the scope of the cases that they do intervene on, this is relatively small. This is not a school with multi-state branches. It is a school located in New Jersey and it is not gigantic like most of those that they have intervened in. The first motion to dismiss was filed in November of 2013. So here's a question that I have for you, Mr. Plaston. So when you look at count one, count one appears to focus more on describing a fraud on the students rather than the government. So how does that satisfy the FAC? The background allegations apply both to the students and the government. And I would ask your honors to look at the account student ledgers that are at 270 through 274 of the appendix. Those were difficult for students to obtain. They were not handed out in the ordinary course. Ms. Watley was refused access to hers at first. She insisted. She got it eventually. What is most interesting when you look at those, because in the most rigorous circuits for pleading particularity, they say give examples. If you look at those... Well, the 9B is two to four, right? I'm only talking about one at the moment, right? I was only referencing a judge. The last case that was written by the circuit on particularity in these cases... Was it published? Yes. It was by Judge Sloboda in 2015, and she pointed out the difference in the circuits. It's a phobia versus renal ventures. It's a False Claims Act case. And she, in that opinion, essentially said the Third Circuit was aligning itself with the more liberal circuits in terms of False Claims Act particularity. The site of it is 754 F3rd 153. She deals with it explicitly at 156 and 157. Citing the recent, and quoting from the anarchist brief of the Solicitor General, where they are saying, pleading the details of the specific false claim presented to the government is not an indispensable requirement, a viable FCA claim. But that case also says, though, that just pleading a mere opportunity for fraud isn't enough, right? Of course not. And in this case, that's why I was asking you to take a look at that exhibit, because it was attached to the first complaint that was filed. It was given to Judge Martini. And what it shows is, and these are examples, the books are a great example of just what is a garden variety fraud on both the government and the students. And if you look at that sheet, you can see it requires a little interpretation, but you can see how the bills are split up between the loans and the Pell Grants. The Pell Grants are a fraud on the federal government because they are giving the money. The loans are a fraud on the students because they are repaying the money. And the loans are designated FDSS, which is, I think, a subsidized loan, and then FDSU is an unsubsidized loan. And the Pell Grant shows the other half of what is paid. Now, when you look at what is charged, that's where the fraud is. And when I say garden variety, I mean, these dwarf, you know, the classic sort of selling a toilet for $1,000. I mean, these are way more abusive than that. These involve books that are the first time they are sold are sold at 10 to 14 times retail value. Now, that's calculated by, you know, they're sold in bulk. I understand your point. That isn't the way the school bills are. I'm trying to go back to the Pell Grant for a moment. Yes. It's okay. No, I'm sorry. I said it's okay. Okay. So on the Pell Grant point, if that is the misrepresentation to the government, is it the application itself or is it the contents of the application? I'm not getting that as the misrepresentation. The account receivable ledger is a document that would be within the purview of the Department of Education. They'd look at it to verify costs and things of that nature. The billing of the books is the problem. I mean, when you bill something, like Kugler, in Kugler, when you were talking about what is the definition of a consumer fraud applied to the sale of books in urban communities, they were saying, oh, my gosh, these are being sold at three times value to people who can't really use them. Every student who is dropped out of these programs or drops out militarily, since the bills are packed up front, has no use for them. They are of no value to the student who drops out, and that is pled. There are no refunds, and that is pled. And in many of these cases, like Watley, her example is... Excuse me, could you put the microphone in front of you? I'm sorry. I usually am too loud. No, you're good. I sort of shy away from the mic. Great. Watley is just a great example of what was going on. She's an only English speaker. She was told, look, it will be much easier for you in the bilingual program, because it's longer and it's just easier standards. So this English speaker is put in the bilingual program. She, after two semesters, according to this ledger, she is transferred, and it is pled. She was told, look, you don't really belong in the bilingual program. You should go to the LPN program. It's shorter. It's actually cheaper, and so go to it. If you look at the receivable ledger, you'll see the books are billed a second time, this time for this shorter course at $3,400. It's the same books. We have them lodged in my office. They're not sold individually, though. Every student, when they go there, what is pled is they are told, more books must be bought from us. More books are here, and they deliver them at orientation. And then they bill them in their IHS. So they're bundled for the course, I guess, right? Yes, they're bundled for not just the course. They're bundled for the entire length of the program, not just the first module. Not just the first module, but all eight, I guess, in the bilingual program, all six in the regular LPN program, and they are required to buy them at those prices. There is readings that point out that some students ask not to buy them from them. There are different examples of the problems, but you can see on the sheets that the second sale, the lab fees, is another thing. We calculated in one of the briefs to Judge Martini that was filed with the court that those lab fees, when you calculate for just the bilingual program, and the single lab, which is pled to be a room with some very basic equipment, a wheelchair, taking blood pressure readings, that lab is rented, that room with that rather ordinary equipment, is rented for that single program, for the morning and for the day program, the adult one, at like $300,000 a year when you calculate it out. There are more than one program. The three that are central to this case would make it astronomical what you are. That's why I say these things dwarf what are the proverbial stories that horrify people about billing to develop. I'm still trying to understand the Pell Grant point. Is it that the Pell Grants, the school induces the students to apply for a Pell Grant, and because they've inflated all of the costs, the students are essentially applying for a larger amount than they would normally, and that that gap between what they should have applied for and what they did apply for is the fraud on the government? Fraud on the government is that the costs I am describing are passed to the government through the Pell Grants in percentages that you can see on each account receivable budget. How is that different from any other Pell Grant? The fraud is in the way the costs are attributed to it. The fraud is, you'll see that she was billed for the books a second time, she was billed for the lab a second time. The fraud is in the way the costs are attributed to it. The duplicative billing? Sure, the processing of the money and application is the same as any other Pell Grant. But the fraud is the duplicative billing? I'm sorry? The duplicative billing? Yes, that's one aspect. The billing for the labs that were insufficient or under-equipped? It wouldn't matter how equipped these labs were. One room for a million dollars is a lot for a year. I mean, and they were, you know, very basic. Your complaint suggests they were under-equipped or ill-equipped. Yes, it does. That's correct. It does. But that is part and parcel of it. The other person whose account receivable ledger was attached to a brief and submitted to Judge Martini, there were three bills for books because she went through three of the programs. And they're essentially the same books. The labs, it's the same thing. And in both of them, remarkably, the lab for the short LPN course is much higher than the lab costs for the BLPN course. It's a few thousand dollars each time. And so it is that pass-through, as exhibited by the AR ledger, that shows you the minutiae of, it's like evidential detail, of what this fraud is. Judge, can we focus on two through four? How do counts two through four satisfy you? Two is the kind of count that Your Honor dealt with in Judge Brown's case. Two is the incentive ban case. You know, when you're not permitted to pay recruiters per head or compensate them as an incentive in any way. But wasn't there a safe harbor, though, during the time you're talking about here? There was a safe harbor during part of the time. It was revoked before much of the time. It was revoked after Judge Greenaway's opinion in the case cited to the panel. It was revoked and upheld. The revocation was upheld in rather strident terms by the DC Circuit, who said, look, the Department of Education has found that this safe harbor thing has been used and is really smoke and mirrors for abuse, and of course this can be revoked. And it was revoked according to my opponent's brief in 2011. I don't know the exact date in 2011. Again, that's the date of Your Honor's brief. So that's a remarkable change from the time Your Honor wrote that opinion. That safe harbor provision was revoked. The DC Circuit said, of course it can. And I asked them to look at the language. I mean, they thought it was a terrible mistake. They sort of backhanded the industry with trying to keep it in place so that they could pursue that. But the two things that happened after Your Honor's opinion that are just dramatic is the most recent opinion in Escobar. And, I mean, somebody once said to me when I first started being a lawyer at the U.S. Attorney's Office, you know, the place to be lucky and better be lucky than good. And so Escobar came down a couple of months ago, and it is dramatically, I mean, they waved off, I think it was George Thomas, but he waved off every objection basically that the false claims defendant was trying to raise. He loosened the Siena requirements. He said, look, really what you need to plead is knowledge of a material difference, you know, something that was material in the sense it would affect the paying entity, in this case the federal government. Yeah, but 9b hasn't been undermined. My question is how do accounts two through four satisfy 9b? Well, okay, if you look at, you know, one thing I did want to say was that this is the only case I have ever seen and was the only case cited in any of the briefs where in response to the first motion to dismiss, a plaintiff was not permitted an opportunity to file a first amended complaint in response to that first motion to dismiss. And, you know, when we analyze it out, there is a way to look from the supplemental amended complaint, which was the draft that was filed for Judge Martini, and go backwards. Yeah, but you made the argument, excuse me, you made the argument that there wasn't specificity in the briefs. I'm sorry. In fact, in the briefs. Okay. Right? I was just saying that since you said you, how would we have, we didn't have notice until the motion came down. Oh, yes. I mean, that's what you wanted to do. We didn't have notice of some of the things Judge Martini picked out, yes. Right, right, but in the brief. We did. Right? There was certainly particularity with regard to what the deficiencies were, right? And to the extent we deemed them appropriate, we changed the pleadings in the amended pleadings, and I did invite your attention to, there's an example of that, this incentive recruiting piece, because at A139 to A140 are the proposed pleadings for that, which include the fact that we would say you look at the standard of the owner and administrator and chief executive officer, Thomas Eastwick, for the violation of this incentive clause. You look at him and he signed the PTA agreement. The government explained that to us when we were talking with him, so it's alleged in here that he personally signed it. He owns the schools in their entirety. He runs them. He had conversations. You have five minutes of rebuttal. Let's get you. I'm sorry. Okay. I appreciate it very much. Okay. May it please the Court, Stephen Gombos. I represent all the defendants. Your Honor, as a housekeeping matter, I reserve five minutes for rebuttal. Court to grant that order for Mr. Brady. Yes. Is there any questions regarding the rebuttal? Well, it's actually not rebuttal, but you guys split the time. No, rebuttal is split. I'm sorry. We know that. You're exactly right. Having listened to the argument today, I can tell you, it brings me back to the point when I read the complaint, and I think Judge Martini summed it up best. It was really hard to discern in this complaint to what was the fraud. Judge Greenaway, you asked what is the fraud on the government. That's a good question, and I'll start where my adversary left off with the incentive compensation bank claims, and I'll even look at the supplemental amended complaint. A139, where he referenced it in the record, that count in the supplemental amended complaint does not state an incentive compensation ban violation with any particularity. It says he acted with intent. It doesn't say who was paid, and nothing of the EDFC district court rule for what. You're left to guess and speculate, and as the panel indicated, the possibility something could be fraud is not enough to meet the standard. Let me ask you that. Okay. Well, you know, it reminds me of the first time. My very first argument was an en banc, and I deferred to Judge Barry, and Judge Slover told me I shouldn't do that, but I'll be happy to take your deference here. Thank you. I wish. The question I have for you is, Mr. Poisted seemed to take pains with regard to count one to say that I'm not sure that his articulation of it today matches the complaint, but his articulation of count one today is that the Pell Grant is sort of the center of the fraud and that the fraud on the government, if I understood him correctly, is the boosting of the various costs and fees and books leads to an application for an inflated or greater amount of the Pell Grant that you might normally apply for, and that that difference between what one would normally apply for and what one would apply for as a result of the exorbitant fees and inflated book costs and so forth, that that gap there is the quantum of the fraud on the government. Okay. If that is so, why doesn't that satisfy the FCA? The fundamental failure of this case is that Mr. Poisted makes that argument to the panel today. He's briefed it at the district court and now at this court, and he has not cited a statute or regulation or law that was violated in detailing the charges as were detailed on the ledger card he referenced. There's nothing that says in the federal law that goes, as your Honor alluded to earlier, fraud on the federal government. If this were an actual cost contract, as the court knows in the federal government contracting rule, it sets what your maximum cost is. If you hide charges and you overcharge through deceptive practices, that would be a classic FCA certification claim. That's not the case here. She's objecting when she changed programs to having to pay for books when she started and lab fees for the next program. She contests that she should have had to do that. I would argue to the panel that might support some type of a consumer claim. But for FCA purposes, there's just nothing grounded in Title IV law that would support the nexus or major material. He references Escobar. We have a vastly different interpretation of Escobar, and I'm arguing that case in other courts. But what is clear from Justice Thomas's opinion is that the new demand behind the FCA materiality standard is critical to look at at the 12b6 and the 9b stage of the pleadings because the court is not going to allow someone to transfer a mere regulatory violation into a fraud action under the False Claims Act, which, going back to your question, and it's a good one, you have to start with the violation of a federal contract or federal law to support that claim. The program participation agreements that are used in the Title IV area are standard. They change a little bit over the 16 years I've been doing this work, but they don't prohibit what Mr. Plaston has argued in his court would support a claim as to a Pell Grant. I will be candid. I did not understand the difference that he was making between a Pell Grant and a loan. He seemed to be maybe he was suggesting that because a Pell Grant is awarded and it doesn't have to be paid back, there's some difference. But in terms of Title IV funding, I don't think there's a difference. The loan programs are subject to the Title IV assistance if you qualify. So I didn't understand that part of it. I'll confess to you. But when you look at the Incentive Account Bank claim and you look at the double billing and the other allegations that he made, this is a classic failure to have the detail. Now, I don't know if that's because this student who attended one of the defendant's schools for 16 months was guessing, copying litigation in the public domain, but certainly I find it hard to believe that she had personal knowledge of what she alleges, as is averted in both versions of this complaint. I don't know how she would know about the incentive compensation program. Your classic case in Title IV is an insider, which a contemplator as this panel well knows is typically someone who had personal knowledge of the circumstances. I understand what you're saying, but isn't that really an inquiry for another day? All we should be looking at here is the face of the complaint, right? I agree. When you look at the face of the complaint, it's woefully deficient. Let me ask you about COUNT II. COUNT II alleges this incentive scheme that violated the relevant CFR. As a program participant, it couldn't pay incentive fees to recruiters, correct? Correct. And it cites the relevant CFR. There's language in the complaint about how bonuses were paid at Christmas parties. Judge Martini, in my view, misinterpreted COUNT II. In his opinion, he talks about how you can't have an incentive ban that prohibits institutions from terminating employees based on recruitment numbers. That's not what the CFR speaks to. The CFR speaks to you can't pay recruiters to up the numbers. Wasn't that played in COUNT II? I don't believe it was played with any particular area, Your Honor. And I believe, and don't hold me to this, I believe Judge Martini was commenting on something either in the complaint, the initial First Amendment complaint, that was at issue, or in the papers that suggested quotas were employed and there may have been adverse consequences if you didn't make those quotas. And what the Bok case and the Corinthian case at Ninth Circuit, one of them was mine, what they held was, no, the ban is exactly as Your Honor has said. It's a ban on paying incentives. Now, when you look at that, for 9B purposes, this goes back to a mere possibility of a violation. I believe cash points were made at the holiday. Well, to who? For what? Do you know if that employee got a small Christmas check for some other reason? Do you think 9B requires name, time, and place? I think 9B requires a factual statement that would support a conclusion that the payment on the face of the allegations was for recruiting a certain number of students. It doesn't. If this plaintiff's claim survives, every case would survive the dismissal. They've got to say, this recruiter received a check, or recruiters received a check, or there was a plan that said if the recruiter was top or recruited a certain number of employees over any period of, I suppose, factors or circumstances, that there was a difference. All that's said here is that we believe that happened, and that's not enough to get over the 12B, 6B, or 9B requirements in my mind. 9B has to put you on notice of what the claim is, right? That's correct. Are you suggesting that you weren't aware of the claim here? You can't defend it? No, and that's very important. It goes to the panel's questions, and Mr. Pleiston, we moved to dismiss this in December. I believe it was December, maybe late November. Two, over two months later, the supplemental amendment complaint was filed with a motion. He was on specific notice of the motion to dismiss and the detail, and this court has held that that's sufficient notice. He was also aware of the cases that we argued, EEMC, the Chubb case, which was a case of this court. So he knew the road map. Judge Greenaway handled that case. He knew the road map if he had the facts. I submit to you he doesn't have the facts, and what's left here, Your Honor, is he's got a verbal allegation for which he's seeking to conduct discovery in hopes that he can state a claim. And Escobar speaks to this directly, and it's the most recent pronouncement of the Supreme Court. Courts are to employ the 9B and detail requirements at the 12B, 6B stage. You've got to let some materiality. I see my time's running out, but if you look at some of the allegations in the supplemental amendment complaint, on information and belief, the school made certifications. On information and belief, class actions, who are his clients, may not speak fluent English. If we don't agree with you on the waiver with regard to count five, why isn't it sufficiently pled to survive? The waiver of count five? You already said, if we don't agree with you on the waiver argument you make regarding count five, that means we'd say there is no waiver. I know it's another world you don't want to contemplate. Why isn't what's pled sufficient? Count five in the first amendment complaint is a conglomeration of counts 124. I don't believe there's any specifics to meet any of those theories in there, is the answer. Thank you. Okay, thank you. Well, we've got another gentleman about to present an argument. Hi, I'm Peter Bright. Good morning. I didn't hear a question about the state law claim, so I was only going to address that if you had an issue. If you'd like to say something, go ahead, you have five minutes. You're welcome. The interest of justice, expediency. So Edward Bennett Williams said, sometimes the best thing to say is nothing. Thank you, counsel. I'm going to read because I know you were all patient with me at the time of the first time. On the count, the count two was changed in response to the motions to dismiss. Paragraphs, if you look at the draft, paragraph 70 to 74 and paragraphs 85 through 89, all were added, as was paragraph 91, alleging specific conversations with Mr. Eastwick, the owner, chief executive, et cetera, about the incentive program. It is changed in a way that makes it almost a cognitive. You said paragraph 91 of the SAC? Of the supplemental amended complaint at A139, paragraphs 70 to 73 were added and paragraphs 85 to 89 were added. And paragraph 90 was changed and changed in a way to allege that the incentive program, as implemented, violated the federal ban. That is a concept that was talked about. Each of those paragraphs that you just mentioned, if your adversary was given the opportunity to stand next to you, he'd say, well, how do they satisfy 9B? So rather than have him get up, I'll ask you. Your Honor, I mean, am I missing something? It doesn't say anything. Is it a matter of futility? I mean, sure, you can throw them in, but does it change the lay of the land? Well, it changes it insofar as this is planned in the same way that United States of America versus education management, in Judge McVeary's opinion, describes the incentive plan in that case, subpart B of his opinion. He says that, look, when you combine all of these specific practices, that is a, you are violating the incentive compensation ban in practice because they combine to put pressure and both positive and negative pressure on the recruiters. And so he called it a culture that made recruiting, enrolling new students, the focus of the compensation system and other things like that. And so, yes, I think those are very specific. They allege practices that were specific practices that caused recruiters, A, to survive, they had to meet their quotas, and B, to get bonuses in cash, they had to as well. I, you know, it's, and to be paying them in cash is in essence paying it in an untraceable fashion. It shows what was discussed and alleged in paragraph 91 that each recruit wasn't supposed to be doing that kind of thing. And so, yes, I think they're more than adequately specific. In terms of, I would point out that, you know, if we come from analyzing this from the supplemental amended complaint, when you were talking about count five, Judge Greenaway, in the first amended complaint, that was essentially dropped out. It was combined with count one because it was Watley's personal experiences of fraud. So count five of the first amended complaint, if we were allowed to file the supplemental complaint, doesn't really exist as a separate cause of action. Count five in the supplemental amended complaint is a consumer fraud action, and that is based on what I call garden variety fraud. How do you respond to counsel's argument that, the waiver argument with respect to count five? He didn't make it, but he pled it. I'm not sure I understand it. What do you mean waiver argument? It wasn't raised in your opening brief. You didn't talk about it specifically, why it was inappropriate to dismiss that count. We were voluntarily, we changed it. If you're talking about the count five that was in the first amended complaint, that was essentially dropped. I approach it from looking at the supplemental amended complaint, where we combined things and dropped count five, essentially, because count five recounted Watley's personal experience with fraudulent practices, her effort to drop out of the school, but still getting billed for the semester she dropped out for. That was combined into the fraudulent scheme, as I would see it, to overbill the government and the students. Are you saying you're dropping count five? What are you saying? Count five from the first amended complaint. If you look at the supplemental amendment, there is a letter that Judge Martini had called, and so we produced a letter, it's at page 200, that shows exactly where the first amended complaint and the supplemental complaint, where they correlate. And so in the middle of that, we explained that, or in the cover letter, if you look at page 201 through 206, it explains the relationship between the first amended complaint and the supplemental amended complaint, which is the first offer of a complaint in response to a motion to dismiss. And it explains that counts one to four are the same, and count five is now a class action for consumer fraud. The count five that existed before was, because it was in the nature of details of the fraud, was put into count one of the supplemental amended complaint. Because it's her personal experiences, and so it is the fraud, but with particular details as she experienced them. All righty. Well, thank you, counsel. We thank all counsel for their arguments, both orally and in writing. And if counsel has no objection, we'd like to greet you at sidebar and thank you more personally.